MARY ROBLES, as Adm'r of the Estate of Ralph Robles, Deceased, Plaintiff-Appellee and Cross-Appellant, v. CHICAGO TRANSIT AUTHORITY, Defendant-Appellant and Cross-Appellee.

First District (2nd Division)   No. 1—90—3217

Opinion filed September 1, 1992.

124

Flynn, Galvin & Ryan, of Chicago (Richard T. Ryan, of counsel), for appellant.

Edward A. Cohen, of Chicago, for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

On December 17, 1980, the decedent, Ralph Robles, was fatally injured while exiting from the side doors at the rear of a Chicago Transit Authority (CTA or defendant) bus. The administrator of his estate, Mary Robles, brought a wrongful death and survival action against the CTA, but the original suit ended in a mistrial. In the subsequent trial, the court directed a verdict in favor of the CTA on the wrongful death and survival counts, which were premised on the doctrine of *res ipsa loquitur*; and the jury found for the CTA on the remaining counts as well. On appeal, this court held that the trial court "erred in directing verdicts for [the CTA] on the *res ipsa [loquitur]* counts" and remanded those counts for a new trial. *Robles v. Chicago Transit Authority* (1988), 173 Ill. App. 3d 46, 54, *appeal denied* (1988), 123 Ill. 2d 566 (*Robles I*).

On remand, seven eyewitnesses testified on behalf of Robles, and according to them, the bus pulled up to the bus stop, reached a complete stop and remained there for several minutes as passengers exited from the rear doors. Many of these witnesses testified that they were standing in line with the decedent in the aisle and in the rear door stairwell waiting to get off the bus. The gist of the testimony of all seven was that as the decedent was attempting to exit the rear doors of the bus, and while the doors were open, the bus, which was still at a stop, began to accelerate, causing the decedent to fall out of and under the bus.

The two witnesses who testified for the CTA gave a sharply conflicting view of the incident. Lloyd Foster, a dean at the high school near the bus stop, who was observing the loading of the bus, testified that the rear doors of the bus were never open while the bus was at the stop. However, Foster did not see the bus pull away. Eva Sanchez, who was sitting in the rear of the bus, testified that no one was standing in the rear door stairwell. According to her, after the bus pulled away from the stop, the decedent pulled the emergency knob, pushed open the rear doors and jumped off the moving bus because another boy had flashed a knife at him.

Earl Jones, who was the night foreman of the CTA's 77th Street garage at the time of the accident, and who at the time of trial was the maintenance superintendent at the same garage, testified as to the operation of the bus' rear door safety interlock system, and was also called by Robles as an adverse witness. His testimony was that if a bus is standing at a bus stop and someone wishes to exit from the rear doors, the driver of the bus may, by moving a lever from neutral to the rear position, unlock the doors so that they may be manually pushed open. After the person exits the bus, the rear doors, which are on springs, will automatically swing shut. According to Jones, the driver cannot accelerate until the lever is moved back into the neutral position. Jones further testified that there is an emergency handle with a knob on its end above the rear doors which when pulled will unlock those doors, thereby allowing the passenger to push them open. If the handle is pulled when the bus is moving, the driver will lose acceleration; but, once the handle is pushed back up, and the doors close, the driver can proceed. According to Jones' testimony, "if the interlock system is working properly, [the bus] cannot accelerate with doors open, with rear doors open."

The jury returned a verdict in favor of Robles on her wrongful death and survival claims based on a finding of negligence inferred through the doctrine of *res ipsa loquitur*; however, the jury also

found the decedent to be 65% negligent. The circuit court denied the CTA's post-trial motion for judgment notwithstanding the verdict and the CTA appeals, contending that the circuit court erred in denying its motion and that this court should enter judgment in its favor because the jury's verdict contained inconsistent findings of fact. Alternatively, the CTA seeks a reversal and remand for a new trial on the grounds that the trial court improperly refused to submit an exhibit to the jury and that it impermissibly admitted the testimony of two expert witnesses into evidence. In her cross-appeal, Robles contends that the trial court erred in failing to award her prejudgment interest and that the lower interest rate applicable to judgments rendered against government entities is unconstitutional as it applies to the CTA. We affirm the judgment of the circuit court in all respects.

Before considering the merits of this appeal, we must determine whether to grant the CTA's motion to supplement the record. On July 24, 1991, Robles filed a motion to dismiss this appeal based on an allegedly incomplete record, which motion we denied on August 7, 1991. In its response to that motion, the CTA argued that the effect of the omissions on our consideration of the appeal would be easily rectified without any prejudice to the plaintiff by our allowing the record to be supplemented. However, the CTA did not file its motion to supplement the record until October 28, 1991, after the briefs were filed and just one week before oral argument. We took the motion and Robles' objections thereto with the case. The supplemental record accompanying the CTA's motion, consisting of certain reports of proceedings, was not bound or certified by the trial court, but it was certified by the court reporter. Robles opposes the motion on the ground that the supplement does not contain the trial judge's certification of correctness or a stipulation of correctness by the parties. In addition, Robles argues that the supplement is insufficient since "several exhibits and sidebar conferences are still excluded along with crucial evidence, including the testimony of several witnesses." Finally, Robles denies that the filing of the supplemental record at this time would not prejudice her.

■■ "The burden is on the appellant to present a record of sufficient completeness in order to question the evidence pertaining to issues raised at trial. [Citation.]" (*Casas v. Liberty Savings & Loan Association* (1984), 128 Ill. App. 3d 68, 69.) Supreme Court Rule 329 (87 Ill. 2d R. 329) permits a reviewing court to correct "[m]aterial omissions or inaccuracies or improper authentication" of the record. Although Robles argues that the record is not certified, we note that "[c]ertification is designed to assure the accuracy of the record, but it

is not a jurisdictional requirement" (*Ray v. Winter* (1977), 67 Ill. 2d 296, 302-03), and we note also that she is not challenging the accuracy of the record. In *Ray*, the court, pursuant to Supreme Court Rule 329, treated the record as having been properly certified where no prejudice was alleged concerning inaccuracies or omissions in the verbatim report of proceedings. Although Robles is challenging the sufficiency of the supplemental record, she has failed to specify what portions are missing from the proffered supplement. At any rate, our review of the proposed supplement reveals that it is sufficiently complete to allow us to consider the merits of the arguments raised on appeal. As to Robles' contention that she will be prejudiced by the timing of the supplemental filing, in *People v. Span* (1987), 156 Ill. App. 3d 1046, 1053, the court allowed the defendant's motion to supplement the record even though it was presented after the briefs were filed because the State would not be unduly prejudiced, its brief having contained an alternative argument based on the merits of the issue. Similarly, here, we fail to apprehend how Robles would be prejudiced if the CTA is allowed to supplement the record in light of the fact that she has presented alternative arguments addressing the merits of all of the issues on appeal. We therefore grant the CTA's motion to supplement the record.

## I

A review of *Robles I*, in which we held that the trial court erred in directing a verdict for the CTA on Robles' *res ipsa loquitur* counts, is essential to an understanding of this case. The court directed the verdict for the reasons expressed in the following colloquy with the plaintiff:

" 'THE COURT: Your argument is the interlock system was defective?

MR. COHEN: One of the arguments.

THE COURT: And that's your basis for the *res ipsa* logic or intention [*sic*]?

MR. COHEN: But for the failure of the interlock system, the accident would not and could not have happened as the witnesses testified that it happened.

\*\*\*

THE COURT: You have no evidence in this case to my knowledge, direct evidence of the defect. Mr. Ryan's motion will be granted on relationship of counts two and four [*sic*].'

In denying plaintiff's motion for reconsideration the court stated:

'Any question, however, in this case, the test pertinent to this Court is [the] second element[,] if the party charged used proper care.

Other speculation[,] we've no evidence that the interlock system was in no way defective to show the CTA was using improper care.

I have no reason to overturn my decision.' " *Robles*, 173 Ill. App. 3d at 51-52.

In *Robles I*, we explained that "[t]he doctrine of *res ipsa loquitur* allows the trier of fact to draw an inference of negligence on the part of defendants from circumstantial evidence" and that "[t]he inference of negligence by circumstantial evidence from otherwise inexplicable facts is particularly appropriate 'when the direct evidence concerning the cause of injury is primarily within the knowledge and control of defendant.' " (*Robles*, 173 Ill. App. 3d at 52-53, quoting *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 449.) With respect to the procedural effect of the doctrine, we further explained:

" 'Like any other proof it may be explained or rebutted by the opposing party. *** [T]he inference, or presumption, does not simply vanish or disappear when contrary evidence appears, but remains to be considered with all the other evidence in the case and must be weighed by the jury against the direct evidence offered by the party charged.
* * *

Whether the doctrine [of *res ipsa loquitur*] applies in a given case is a question of law which must be decided by the court, but once this has been answered in the affirmative, it is for the trier of fact to weigh the evidence and determine whether the circumstantial evidence of negligence has been overcome by defendant's proof.' " *Robles*, 173 Ill. App. 3d at 53, quoting *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 449-50.

Applying these principles to the facts of the case, we stated:

"Here, there was testimony that the bus accelerated while the rear doors were open, and according to the CTA's garage foreman [Jones] that should have not occurred if the interlock system was functioning properly. Further, defendants drove and maintained the bus and thus had control over it; the fact that Robles was able to open the rear doors does not negate the control defendants had over the bus." *Robles*, 173 Ill. App. 3d at 53, citing *Douglas v. Board of Education* (1984), 127 Ill. App. 3d 79.

Quoting *Dyback v. Weber* (1986), 114 Ill. 2d 232, 234, this court noted:

> " 'A plaintiff need not conclusively prove all the elements of *res ipsa loquitur* in order to invoke the doctrine. He need only present evidence reasonably showing that [the requisite] elements exist.' [Citation.]" *Robles*, 173 Ill. App. 3d at 53-54.

Because "there was sufficient evidence from which the jury could have inferred negligence," we held that the trial court erred in directing the verdict and remanded the *res ipsa loquitur* counts for a new trial. *Robles*, 173 Ill. App. 3d at 54.

As pointed out by Robles, in the instant case, the doctrine of the law of the case "holds that when a judgment of a trial court is reversed and remanded, the trial court is bound by the reviewing court's resolution of the questions presented to it and must proceed in a manner consistent with the reviewing court's directions." (*People v. Webb* (1982), 109 Ill. App. 3d 328, 330, citing *National Boulevard Bank v. Department of Transportation, Division of Highways* (1979), 78 Ill. App. 3d 168, 170.) " 'After a judgment is reversed and the cause is remanded the [trial court] can take only such further proceedings as conform to the judgment of the appellate [court]. If specific directions are given nothing can be done except carry out those directions. If no specific directions are given it must be determined from the nature of the case what further proceedings will be proper and not inconsistent with the opinion.' " (*Webb*, 109 Ill. App. 3d at 331, quoting *Roggenbuck v. Breuhaus* (1928), 330 Ill. 294, 297-98.) It is clear that in *Robles I* we determined, as a matter of law, that Robles sufficiently established the elements of *res ipsa loquitur* in order to get her case to the jury. *Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266, 274.

Nevertheless, as discussed in *Robles I*, the doctrine merely creates a permissive inference of negligence which may be overcome by the defendant's proof. (*Metz*, 32 Ill. 2d at 449-50; W. Keeton, Prosser & Keeton on Torts §40, at 257-58 (5th ed. 1984).) Despite the application of *res ipsa loquitur* to the case, the jury was free to find in favor of either side based upon the evidence adduced at trial. On remand, the jury was instructed that the plaintiff had the burden of proving:

> "FIRST: THAT THE DECEDENT, RALPH ROBLES, WAS INJURED.
>
> SECOND: THAT THE INJURY WAS RECEIVED AS A RESULT OF A MALFUNCTION OF THE REAR DOOR SAFETY INTERLOCK SYSTEM WHICH WAS UNDER THE CHICAGO TRANSIT AUTHORITY'S CONTROL.

THIRD: THAT IN THE NORMAL COURSE OF EVENTS, THE INJURY WOULD NOT HAVE OCCURRED IF THE CHICAGO TRANSIT AUTHORITY HAS [sic] USED THE HIGHEST DEGREE OF CARE CONSISTENT WITH THE TYPE OF VEHICLE USED AND THE PRACTICAL OPERATION OF ITS BUSINESS AS A COMMON CARRIER BY BUS WHILE THE REAR DOOR SAFETY INTERLOCK SYSTEM WAS UNDER THEIR [sic] CONTROL."

In addition, the jury was instructed:

"IF YOU FIND THAT EACH OF THESE PROPOSITIONS HAS BEEN PROVED, THE LAW PERMITS YOU TO INFER FROM THEM THAT THE CHICAGO TRANSIT AUTHORITY WAS NEGLIGENT WITH RESPECT TO THE REAR DOOR SAFETY INTERLOCK SYSTEM WHILE IT WAS UNDER ITS CONTROL OR MANAGEMENT.

IF YOU DO DRAW SUCH AN INFERENCE, AND IF YOU FURTHER FIND THAT THE DECEDENT, RALPH ROBLES' INJURY WAS PROXIMATELY CAUSED BY THAT NEGLIGENCE, YOUR VERDICT MUST BE FOR THE PLAINTIFF."

However, the jury was also instructed:

"ON THE OTHER HAND, IF YOU FIND THAT ANY OF THESE PROPOSITIONS HAS NOT BEEN PROVED, OR IF YOU FIND THAT THE CHICAGO TRANSIT AUTHORITY USED THE HIGHEST DEGREE OF CARE CONSISTENT WITH THE TYPE OF VEHICLE USED AND THE PRACTICAL OPERATION OF ITS BUSINESS AS A COMMON CARRIER BY BUS FOR THE SAFETY OF RALPH ROBLES IN ITS CONTROL OF THE REAR DOOR SAFETY INTERLOCK SYSTEM, OR IF YOU FIND THAT THE DEFENDANT'S NEGLIGENCE, IF ANY, WAS NOT A PROXIMATE CAUSE OF THE DECEDENT, RALPH ROBLES' INJURY, THEN YOUR VERDICT SHOULD BE FOR THE CHICAGO TRANSIT AUTHORITY."

If the jury found for Robles, it was instructed to consider the CTA's claim that the decedent was contributorily negligent.[1] As to that claim the jury was instructed that the defendant had the burden of proving the following:

---

[1]The trial court used the term "contributory negligence" throughout the case; in order to prevent confusion, we retain its use in this opinion in all of the instances in which the trial court employed it.

"FIRST, THAT WHILE THE BUS WAS MOVING, THE DE-CEDENT, RALPH ROBLES, CARELESSLY PULLED THE EMERGENCY HANDLE, PUSHED OPEN THE REAR DOORS AND JUMPED OFF THE MOVING BUS.

SECOND, THAT RALPH ROBLES' NEGLIGENCE WAS A PROXIMATE CAUSE OF HIS INJURY."

If the jury found that the CTA proved each of these propositions, it was instructed to reduce Robles' damages accordingly. Although the jury found in favor of Robles and against the CTA, it also found that 65% of the negligence was attributable to the decedent.

In the instant appeal, the CTA raises several arguments as to the application of *res ipsa loquitur* to this case. It first asserts that the jury's finding of negligence against it pursuant to the doctrine of *res ipsa loquitur* is irreconcilably inconsistent with the jury's finding of 65% contributory negligence on behalf of the decedent. The CTA further urges that the factual basis of the jury's finding of contributory negligence that " 'while the bus was moving, decedent, Ralph Robles, carelessly pulled the emergency handle, pushed open the rear doors and jumped off the moving bus' " precludes a finding that the instrumentality of the decedent's demise was within its control. The CTA further avers that the jury's inconsistent verdict resulted from the circuit court's improper "refusal to instruct the jury that it should not *** consider the allegations of specific acts of negligence by the [CTA] and its driver, Ernest Brown."[2] Accordingly, the CTA contends that the trial court erred in refusing to grant it judgment notwithstanding the verdict.

■ Judgments notwithstanding the verdict should be "entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) The doctrine of *res ipsa loquitur* "traditionally ha[s] required the plaintiff to demonstrate three elements: (1) that the occurrence is one that ordinarily would not happen in the absence of negligence; (2) that the defendant had exclusive control of the instrumentality that caused the event; and (3) that the occurrence was not caused by the plaintiff's own negligent acts or omissions. [Citation.]" (*Dyback v.*

---

[2]At oral argument before this court, the CTA also argued that *res ipsa loquitur* did not apply because there was direct evidence of negligence. However, because the CTA did not argue this point in its brief, we need not consider it here. 134 Ill. 2d R. 341(e)(7).

*Weber* (1986), 114 Ill. 2d 232, 238.) The CTA cites *Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266, and *Politakis v. Inland Steel Co.* (1983), 118 Ill. App. 3d 249, in support of the third element that the injury must not be due to any voluntary act or negligence on the part of the plaintiff. However, this element is no longer required in order to establish a *prima facie* case of negligence using *res ipsa loquitur.* As a result of the adoption of pure comparative negligence in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, which ordered its application to all cases in which trial was commenced on or after June 8, 1981 (*Alvis*, 85 Ill. 2d at 28), the Illinois Supreme Court held in *Dyback* that "a plaintiff's freedom from contributory negligence should no longer be a requirement in order to make out a *prima facie* case under the doctrine." *Dyback*, 114 Ill. 2d at 239.

In *Dyback*, the court pointed out that several other comparative fault jurisdictions had eliminated proof of a plaintiff's freedom from contributory negligence as an element of *res ipsa loquitur.* (*Dyback*, 114 Ill. 2d at 239.) Of the jurisdictions cited, the court noted that those having a modified form of comparative fault bar recovery on *res ipsa loquitur* claims "where the plaintiff is found more than 50% negligent." (*Dyback*, 114 Ill. 2d at 239.) However, our supreme court adopted the reasoning of the New Mexico Supreme Court, the only jurisdiction cited which had a pure form of comparative negligence as Illinois did at the time,[3] which stated that " '[t]he mere existence of concurrent negligence does not preclude a particular finding of negligence of one or more tortfeasors through reliance on the *res ipsa loquitur* doctrine. Otherwise, "we would effectively erect a complete bar to recovery in cases where a plaintiff must rely on *res ipsa loquitur* to establish a *prima facie* case of negligence. *** Such a result would be in direct contravention of the concept of comparative negligence." ' *Tipton v. Texaco, Inc.* (1985), 103 N.M. 689, 697, 712 P.2d 1351, 1359, quoting *Montgomery Elevator Co. v. Gordon* (Colo. 1980), 619 P.2d 66, 70." (*Dyback*, 114 Ill. 2d at 239-40; *Gatlin v. Ruder* (1990), 137 Ill. 2d 284, 295-96.) Accordingly, we agree with the circuit judge in the instant case, who explained the compatibility of the two doctrines as follows:

---

[3]Although section 2—1116 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1116) replaced the pure form of comparative negligence adopted in *Alvis* with a modified form, section 2—1116 applies only to causes of action accruing on or after November 25, 1986 (Ill. Rev. Stat. 1987, ch. 34, par. 429.7); therefore, this is a pure comparative negligence case.

"Even where *res ipsa loquitur* is operative in a case, I believe that the doctrine of comparative fault still is operative in Illinois. I think, on the evidence that we have here, if the jury found, based upon the evidence it had before [it] that the CTA was accountable; then the jury could have considered the contributory fault of the decedent in allocating the degree of responsibility in terms of damages of the CTA. I don't think a case that goes to the jury, res ipsa loquitur requires a finding by the jury that the plaintiff, the injured party, be free of any responsibility whatsoever."

Therefore, it is clear that the decedent's contributory negligence does not preclude Robles from pursuing and prevailing on her *res ipsa loquitur* claims; it is also evident that the CTA overlooks that the cases it relies upon to the contrary pertain to trials begun before June 8, 1981, the cut-off date established in *Alvis*.

However, the CTA also claims that the factual basis of the jury's finding of 65% contributory negligence, that " 'while the bus was moving, decedent, Ralph Robles, carelessly pulled the emergency handle, pushed open the rear doors and jumped off the moving bus,' " precludes her from meeting the second element of the *res ipsa loquitur* doctrine, which is control. The purpose of this requirement is to link the defendant with the probability that the accident would not ordinarily have occurred in the absence of negligence; that it was the defendant's negligence which caused the accident. (W. Keeton, Prosser & Keeton on Torts §39, at 248-49 (5th ed. 1984).) As pointed out by the CTA, "[t]he injury must either be traced to a specific instrumentality or cause for which the defendant was responsible, or it must be shown that the [defendant] was responsible for all reasonably probable causes to which the accident could be attributed." W. Keeton, Prosser & Keeton on Torts §39, at 248 (5th ed. 1984); see also *Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266, 273, quoting Restatement (Second) of Torts §328D, Explanatory Notes, Comment *g* (1965).

However, "[w]here such other causes are in the first instance equally probable, there must be evidence which will permit the jury to eliminate them. *** [T]he evidence need not be conclusive, and only enough is required to permit a finding as to the greater probability." (W. Keeton, Prosser & Keeton on Torts §39, at 249 (5th ed. 1984).) "This element usually is stated as meaning that the defendant must be in 'exclusive control' of the instrumentality which has caused the accident." (W. Keeton, Prosser & Keeton on Torts §39, at 249 (5th ed. 1984).) However, " '[c]ontrol' if it is not to be pernicious and mislead-

ing, must be a very flexible term." (W. Keeton, Prosser & Keeton on Torts §39, at 250 (5th ed. 1984); see also *Lynch*, 93 Ill. 2d at 274.)

" 'It is not, however, necessary to the inference that the defendant have such exclusive control; and exclusive control is merely one way of proving his responsibility. He may be responsible, and the inference may be drawn against him, where he shares the control with another ***. He may be responsible where he is under a duty to the plaintiff which he cannot delegate to another ***. He may be responsible where he is under a duty to control the conduct of a third person ***. *** The essential question becomes one of whether the probable cause is one which the defendant was under a duty to the plaintiff to anticipate or guard against.' " *Lynch*, 93 Ill. 2d at 273-74, quoting Restatement (Second) of Torts §328D, Explanatory Notes, Comment *g* (1965).

According to the CTA, Robles "was unable to present evidence as to the instrumentality which caused the death of her decedent. The only *evidence* presented with respect to the operation of the rear door of the Chicago Transit Authority bus in question was that the rear door interlock system of the bus was working both before and after the incident in question, that no defects were discovered when the bus was checked after the incident, and that the rear door interlock system was not 'self-correcting' (meaning that if a defect existed at the time of the incident, that defect could not correct itself)." (Emphasis in original.) Therefore, the CTA concludes that Robles "was unable to demonstrate that the defendant's actions were responsible for all reasonable causes to which the accident could be attributed."

■ Although "[l]iability cannot be predicated upon surmise or conjecture as to the cause of the injury" (*Salinas v. Werton* (1987), 161 Ill. App. 3d 510, 514, *appeal denied* (1988), 118 Ill. 2d 551), seven eyewitnesses testified on behalf of Robles that as the decedent attempted to exit the rear doors of the bus, while the doors were open, the bus, which had been stopped, began to accelerate causing him to fall. Robles also called, as an adverse witness, Earl Jones of the CTA, who testified that "if the interlock system is working properly, [the bus] cannot accelerate with the doors open, with rear doors open." In contrast, the CTA called Eva Sanchez, who testified that the decedent pulled the emergency knob, opened the doors and jumped off the moving bus. The CTA also called Jones, who testified that on November 22, 1980, there was a general inspection of the bus including the safety interlock system and that the bus was returned to service. He testified further that on December 22, 1980, the rear doors of the bus

"were checked and found okay." A review of this evidence makes it clear that Robles' theory of the case was that the rear door interlock system failed and that she presented enough evidence from which the jury could have inferred negligence if it believed the testimony that the bus started to move as the decedent was alighting, as we held in *Robles I*. (See Annot., *Application of Res Ipsa Loquitur Doctrine to Accidents Incurred by Passenger While Boarding or Alighting from a Carrier*, 93 A.L.R.3d §4[a], at 784-87 (1979), citing *Moeller v. Market Street Ry. Co.* (1938), 27 Cal. App. 2d 562, 81 P.2d 475, *Moehle v. St. Louis Public Service Co.* (Mo. Ct. App. 1950), 229 S.W.2d 285, and *Paul v. Salt Lake City R.R. Co.* (1905), 30 Utah 41, 83 P. 563. But see Annot., 93 A.L.R.3d §4[b], at 787-88 (1979), citing *Holmes v. Birmingham Transit Co.* (Ala. 1959), 116 So.2d 912, and *Wyatt v. Pacific Electric Ry. Co.* (1909), 156 Cal. 170, 103 P. 892.) "In many cases the inference to be drawn is a double one, that the accident was caused in a particular manner, and that the defendant's conduct with reference to that cause was negligent." W. Keeton, Prosser & Keeton on Torts §39, at 247 (5th ed. 1984).

In *Moehle*, the trial court was held not to have erroneously shifted the burden of proof to defendant where a *res ipsa loquitur* instruction told the jury that if it found certain facts to be true, including that the bus jerked while the passenger was alighting, it was sufficient to warrant a finding of negligence. (*Moehle*, 229 S.W.2d 290-91.) Similarly, here, if the jury believed the accounts of the seven eyewitnesses called on behalf of Robles and the testimony of Jones, there was sufficient evidence from which it could have inferred negligence. Counsel for the CTA acknowledged as much at oral argument stating, "Earl Jones testified *** that there's no doubt if a bus starts up and accelerates, that there's something wrong with the interlock. We're negligent. A bus can't operate like that. A bus cannot stop, start up, from a bus stop with the rear doors open and accelerate unless there's a defect in the interlock system."

Moreover, as we stated in *Robles I*, "the fact that Robles was able to open the rear doors does not negate the control defendants had over the bus." (*Robles*, 173 Ill. App. 3d at 53.) In *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 450, the court explained that the requirement of exclusive control by the defendant "doesn't mean actual physical control at the time of the accident, if the instrumentality or dangerous agency is one which it is defendant's responsibility to maintain at all times and which responsibility cannot be delegated by consent, agreement or usage." Clearly, in light of the high degree of care owed by the CTA to its passengers when they are

exiting its buses (*Crutchfield v. Yellow Cab Co.* (1989), 189 Ill. App. 3d 1091, *appeal denied* (1990), 129 Ill. 2d 562, citing *Katamay v. Chicago Transit Authority* (1972), 53 Ill. 2d 27), it is the CTA's responsibility to maintain the rear door interlock system on the bus.

While in hindsight the fact that the jury found the decedent 65% contributorily negligent seems inconsistent with the application of *res ipsa loquitur*, at the time we determined that the doctrine was applicable in *Robles I* and at the time the case was submitted to the jury after remand, the requirement was met that there be evidence to permit the jury to eliminate any other equally probable causes and that there be enough evidence to permit a finding as to the greater probability. (W. Keeton, Prosser & Keeton on Torts §39, at 249 (5th ed. 1984).) Furthermore, while the finding of 65% contributory negligence also appears to be inconsistent with the rationale behind the element of control, as our supreme court stated in *Dyback,* " '[t]he analysis, from the viewpoint of comparative negligence, focuses on whether a "defendant's inferred negligence was, more probably than not, *a* cause of the injury \*\*\* though [the] plaintiff's [or third party's] negligent acts or omissions may also have contributed to the injury" ' *Tipton v. Texaco, Inc.* (1985), 103 N.M. 689, 697, 712 P.2d 1351, 1359, quoting *Montgomery Elevator Co. v. Gordon* (Colo. 1980), 619 P.2d 66, 70." (Emphasis added.) *Dyback,* 114 Ill. 2d at 240.

For these reasons we hold that the factual basis for the jury's finding the decedent 65% contributorily negligent is not inconsistent with the defendant's control of the rear door interlock system; accordingly, we need not address the CTA's argument that the alleged inconsistency would have been prevented if the trial court had given the CTA's proffered instruction cautioning the jury not to consider allegations of specific negligence on the part of the CTA or its bus driver. Furthermore, the judge sustained many of the CTA's objections to such testimony. In any event, we fail to perceive how the CTA was prejudiced by testimony, which it claimed at trial related to "what the bus driver did after this incident was over." Finally, we note that "the introduction of some evidence which tends to show specific acts of negligence on the part of the defendant, but does not purport to furnish a full and complete explanation of the occurrence \*\*\* does not deprive the plaintiff of the benefit of *res ipsa loquitur.*" W. Keeton, Prosser & Keeton on Torts §40, at 260 (5th ed. 1984); *Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 397-98; *Daly v. Carmean* (1991), 210 Ill. App. 3d 19, 27, *appeal denied* (1991), 141 Ill. 2d 538.

## II

■ The CTA also contends that the trial court erred in refusing to grant the jury's request to see the computer printout of the repair and maintenance records of the bus. The CTA claims that it was prejudiced by this refusal because the jury was unable to "confirm" that in 1980 there were six general inspections of the bus, as well as that the door emergency control was repaired on November 7, 1980, inspected on November 22, 1980, and checked on December 22, 1980. Although Robles claims that the exhibit was never admitted into evidence and that, therefore, there was no error, it appears from the supplemental record that it was admitted into evidence, but not submitted to the jury. "The decision to submit exhibits to the jury is within the sound discretion of the trial court, whose decision will not be reversed absent an abuse of discretion. [Citation.]" (*People v. Herron* (1991), 218 Ill. App. 3d 561, 575.) We are unable to conclude that the CTA was prejudiced by the court's refusal to submit the exhibit to the jury inasmuch as Earl Jones, maintenance superintendent at the CTA's 77th Street garage, who was the night foreman at the time of the accident, testified at length as to these repairs. Although there was some question as to the sufficiency of the foundation for the computer record, the circuit judge did not submit the record to the jury because "it was not clear to [him] how the jury would interpret the records in view of the fact that a multitude of codes had been used." According to the judge, the records would have created "a hopeless task" for the jury. Accordingly, we hold that the circuit judge did not abuse his discretion in refusing to allow the exhibit to go to the jury.

## III

Finally, the CTA claims that the trial court improperly permitted Robles to present expert testimony in rebuttal to its case. First, the CTA objects to the testimony of Roland Ruhl, which it claims was reconstruction testimony used to rebut the testimony of eyewitness Eva Sanchez. Second, the CTA objects to the testimony of Dror Kopernik, which it claims was "rank speculation," and to his use of a demonstrative exhibit which it claims has a "built-in defect."

"Whether expert testimony should be introduced is a matter within the discretion of the trial judge. [Citation.]" (*Misch v. Meadows Mennonite Home* (1983), 114 Ill. App. 3d 792, 800.) "Rebuttal evidence is that which tends to explain, repel, contradict, counteract or disprove facts already placed in evidence by an adverse party." (*Hall v. Northwestern University Medical Clinics* (1987), 152 Ill. App. 3d

716, 721, *appeal denied* (1987), 115 Ill. 2d 541.) "The decision to permit rebuttal testimony rests largely in the discretion of the trial court [citations], and that decision will not be reversed on appeal unless the court has abused its discretion resulting in prejudice to the defendant [citations]." *People v. Williams* (1991), 209 Ill. App. 3d 709, 723, *appeal denied* (1991), 139 Ill. 2d 604.

■ As to the testimony of Ruhl, "reconstruction testimony may not be used as a substitute for eyewitness testimony where such is available. Whether it may be used in addition to eyewitness testimony is determined by whether it is necessary to rely on knowledge and application of principles of science beyond the ken of the average juror." (*Plank v. Holman* (1970), 46 Ill. 2d 465, 470-71.) "[T]here appears to be a certain amount of confusion as to when reconstruction testimony may be received when eyewitness testimony is available." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §703.2, at 533 (5th ed. 1990); *Augenstein v. Pulley* (1989), 191 Ill. App. 3d 664, 678, *appeal denied sub nom. Augenstein v. Steinmetz* (1990), 131 Ill. 2d 557.) The "lack of clarity in the approach of the decisions [on this issue] leaves the matter very much in the discretion of the trial court." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §703.2, at 533 (5th ed. 1990).) However, the court in *Augenstein*, through its comprehensive examination of the authorities on this issue, gleaned the following two requirements for the use of expert reconstruction testimony: (1) that the expert be appropriately qualified, and (2) that the jury be assisted by testimony regarding knowledge beyond that which they would ordinarily have. (*Augenstein*, 191 Ill. App. 3d at 679.) According to the court, the presence or absence of eyewitness testimony is only one of the criteria used to determine admissibility and it obviously applies only to the second prerequisite, dealing with admissibility. *Augenstein*, 191 Ill. App. 3d at 681.

In *Augenstein*, a mechanical engineer testified that in his opinion the collision occurred in the northbound lane of traffic. (*Augenstein*, 191 Ill. App. 3d at 672.) Although the court acknowledged the preference for eyewitness testimony, particularly in automobile accident cases (*Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill. 2d 353), it held that the trial court did not err in admitting the expert testimony, despite the availability of eyewitness testimony to the accident, since the expert was properly qualified and his testimony could be of assistance to the jury. (*Augenstein*, 191 Ill. App. 3d at 679-81; see also *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118.) Similarly, here, there is no

dispute as to Ruhl's qualifications. Although his testimony was used to contradict Eva Sanchez' account of the accident, we believe his testimony was of assistance to the jury. Ruhl performed time, distance and velocity calculations based on his review of a plat of the accident scene, the police report, the bus specifications, a study of the acceleration of 24 CTA buses, and the testimony of the witnesses to the accident. For example, Ruhl testified as to the force that would be applied to the body of a person exiting the bus. Although we are cognizant of the danger that an expert may unduly impress the jury (*Augenstein*, 191 Ill. App. 3d at 675, citing Burns, *Evidence: The Role of Reconstruction Experts in Witnessed Accident Litigation*, 22 DePaul L. Rev. 7, 14 (1972)), in this case, we are persuaded by the view expressed by the trial judge in the *Augenstein* case:

"[N]ow whether the jury wants to believe him or not is up to them. They have the other version before them. \*\*\* The mass difference in these two vehicles travelling at the same speed in a curve and the principles of physics acting upon these vehicles to reconstruct the point of impact relative to the gouge marks and where they ended up, it is necessary that the jury have somebody to explain these principles to them." (*Augenstein*, 191 Ill. App. 3d at 672.)

Therefore, we hold that the trial court did not abuse its discretion in permitting Ruhl to testify.

As to Kopernik's testimony, the CTA claims that it was not rebuttal testimony and that his opinion was speculative. Ralph Malec testified on behalf of the CTA that there are only two ways in which the rear doors can be opened: (1) if the driver of the bus moves a handle which unlocks the doors thereby allowing the passenger to push them open; or (2) if the passenger pulls on an emergency knob located above the rear doors which unlocks them thereby allowing the passenger to push them open. According to Malec, when the system is activated in either of these two ways, a push-button microswitch is triggered which turns on the light and transmits a signal to a valve which prevents the bus from accelerating. Robles argues that her witness testified as to a third way in which the system could be activated in rebuttal to Malec's testimony: while the doors are unlocked and open, the driver could put the handle back in the neutral position which the driver thinks locks the doors, but the interlock system could be on or off depending on the adjustment of the microswitch. We believe this was proper rebuttal testimony.

■ The CTA also objects to the following opinion expressed by Kopernik as to the possible intermittent operation of the system, on the ground that it is speculative.

"Q. Okay. Thank you. Now based upon your investigation in this case, including the inspection of the bus which you personally performed, in your expertise in the field as an engineer and your review of the manual that you spoke about and the other documents that you previously testified about, do you have an opinion based on a reasonable degree of engineering certainty as to whether the particular interlock system on this bus could be out of adjustment so that it works intermittently?

MR. RYAN: Objection, Your Honor.

THE COURT: You may answer.

THE WITNESS: Yes.

BY MR. COHEN:

Q. And what is that opinion, sir?

A. That it could."

As the CTA points out, "a witness may not guess or state an opinion which is based merely on speculation or conjecture. [Citations.]" (*Loitz v. Remington Arms Co.* (1988), 177 Ill. App. 3d 1034, 1051, *aff'd in part & reversed in part* (1990), 138 Ill. 2d 404.) In *Schultz v. Hennessy Industries, Inc.* (1991), 222 Ill. App. 3d 532, the plaintiff's expert testified that the "design and manufacture of the subject switch raised the possibility that a foreign object or substance could enter the switch and short out the circuit." However, the expert stated that "his examination of the switch revealed no physical evidence to suggest that the circuit had been shorted out at the time of the accident, and that he did not observe any foreign object or moisture in the switch, or any visible markings or residue indicating that some foreign object or substance had previously been inside the switch." In addition, he testified that "there was no evidence that any of the component parts of the switch had become loose or that loose parts caused the subject car to start," or that "the alligator clips attached to the solenoid had crossed to cause a short circuit." The expert "could not testify that the circuit had been shorted out and stated that such an opinion would be based on speculation." (*Schultz*, 222 Ill. App. 3d at 541-42.) The court found it evident that "all of the expert testimony presented by plaintiff as to the cause of the accident and the dangerous condition of the remote starter switch was based purely on speculation and conjecture." (*Schultz*, 222 Ill. App. 3d at 542.) The court stated that

"[e]xpert testimony based on speculation, guess, or conjecture is insufficient to avoid summary judgment" and found that the "mere possibility [of] a short circuit *** is insufficient to establish a causal relationship between defendant's alleged negligence and plaintiff's injuries." *Schultz*, 222 Ill. App. 3d at 542-43.

Similarly, here, Kopernick admitted on cross-examination that a "misadjusted" switch would need to be repaired and that the system was working properly at the time of his inspection. However, although he also admitted that in prior deposition testimony he stated that without the testimony of Robles' witnesses, there was no basis for his statement that there was a "misadjusted" switch, that testimony distinguishes this case from *Hennessy*. In any event, even if the admission of this testimony did constitute error, it would not require reversal since it did not substantially prejudice the CTA. *Yassin v. Certified Grocers of Illinois, Inc.* (1986), 150 Ill. App. 3d 1052, 1064, *appeal denied* (1987), 114 Ill. 2d 559.

■ Finally, the CTA objects to Kopernik's use of a demonstrative exhibit of the interlock system. However, the CTA has not included the exhibit in the record on appeal and in its absence, we must presume that the trial court's ruling on this issue was correct. *People v. Quinn* (1988), 173 Ill. App. 3d 597, 606, *appeal denied* (1988), 123 Ill. 2d 564; *Robles*, 173 Ill. App. 3d at 54.

IV

Turning to issues raised in the cross-appeal, Robles contends that the trial court erred in failing to award her prejudgment interest and that the lower interest rate applicable to judgments entered against government entities is unconstitutional as it applies to the CTA.

■ As to Robles' first contention, the rule is well established in Illinois that prejudgment interest is not allowed unless authorized by statute. (*Lakefront Realty Corp. v. Lorenz* (1960), 19 Ill. 2d 415, 423.) "Section 2 of the Interest Act does not authorize prejudgment interest in wrongful death or other tort cases. (See Ill. Rev. Stat. 1977, ch. 74, par. 2.)" (*Gardner v. Geraghty* (1981), 98 Ill. App. 3d 10, 14; Ill. Rev. Stat. 1989, ch. 17, par. 6402.) However, Robles argues that the language of the Wrongful Death Act (Ill. Rev. Stat. 1979, ch. 70, par. 1 *et seq.*) contemplates the award of prejudgment interest. The Act provides in part:

"[I]n every such action the jury may give such damages as they shall deem a fair and just compensation with reference

to the pecuniary injuries resulting from such death \*\*\*." (Ill. Rev. Stat. 1979, ch. 70, par. 2.)

In support of her position, Robles cites *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979* (N.D. Ill. 1979), 480 F. Supp. 1280, 1286, *aff'd* (7th Cir. 1981), 644 F.2d 633, in which the court concluded that prejudgment interest was "an essential element of 'fair and just compensation' under the Illinois wrongful death statute." However, the Federal district court's interpretation of the Illinois Wrongful Death Act is not binding on this court. *Russ v. Pension Consultants Co.* (1989), 182 Ill. App. 3d 769, 776.

In *Johnson v. Human Rights Comm'n* (1988), 173 Ill. App. 3d 564, 567, *appeal denied* (1988), 123 Ill. 2d 559, the court declined to award prejudgment interest under section 8—108(J) of the Illinois Human Rights Act (Ill. Rev. Stat. 1985, ch. 68, par. 8—108(J)), which provided that the Commission should "[t]ake such action as may be necessary to make the individual complainant whole." The court reasoned, "We do not believe that the right to prejudgment interest can be implied from a statutory provision. To the contrary, we believe that such a remedy must be clearly and specifically provided for by the legislature." (*Johnson*, 173 Ill. App. 3d at 567.) We agree. Although Robles has raised several public policy reasons in support of her position, the debate over the award of prejudgment interest under the Wrongful Death Act more properly belongs in the chambers of the General Assembly since the language of the Act does not clearly provide for it. Therefore, the circuit court was correct in declining to award prejudgment interest under the Illinois Wrongful Death Act.

V

Robles also contends that section 2—1303 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1303), which provides for a lower interest rate for judgments rendered against government debtors than is applied to judgments rendered against private sector debtors, violates her right to equal protection of the law under the United States and Illinois Constitutions. (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2.) The parties agree that the rational basis test applies in determining the constitutionality of the classification since neither a fundamental right nor a suspect class is involved. (*Harrington v. City of Chicago* (1983), 116 Ill. App. 3d 137, 139.) "Under that test, the court determines whether the statutory classification is rationally related to a legitimate governmental purpose." (*Harrington*, 116 Ill. App. 3d at 139.) "In making this

determination, it is constitutionally irrelevant what reasons in fact served as the basis for the legislation." *Harrington,* 116 Ill. App. 3d at 139.

■■■ In *Harrington,* the court upheld the constitutionality of section 2—1303 under the rational basis test as it applied to the City of Chicago since the "legislature may well have enacted the disparate interest rates in order to somewhat lessen the burden on taxpayers who ultimately pay for judgments rendered against governmental entities." (*Harrington,* 116 Ill. App. 3d at 139.) However, Robles argues that *Harrington* is distinguishable because the CTA, unlike the City of Chicago, does not have the power to levy taxes. (See Ill. Rev. Stat. 1989, ch. 111⅔, par. 318.) We note, however, that the CTA does receive tax money. Pursuant to the Metropolitan Transit Authority Act (Ill. Rev. Stat. 1989, ch. 111⅔, par. 301 *et seq.*), the CTA is authorized to receive funds and grants from the Regional Transportation Authority (RTA) (Ill. Rev. Stat. 1989, ch. 111⅔, pars. 309a(b), (c)), which, pursuant to the Regional Transportation Authority Act (Ill. Rev. Stat. 1989, ch. 111⅔, par. 701.01 *et seq.*), is authorized to allocate a percentage of the taxes it collects within the City of Chicago to the CTA (Ill. Rev. Stat. 1989, ch. 111⅔, par. 704.01(d)). The RTA is also authorized to receive local, State and Federal funds. (Ill. Rev. Stat. 1989, ch. 111⅔, par. 704.02.) In any event, if this court can discern any reasonable basis for the classification the statute will be upheld. (*Harrington,* 116 Ill. App. 3d 137.) Clearly, the legislature may well have enacted the favorable rate in order to lessen the burden borne not only by "taxpayers who ultimately pay for judgments rendered against" the CTA (*Harrington,* 116 Ill. App. 3d at 139), but also by those who depend upon a highly subsidized public transportation system. (See *Bilyk v. Chicago Transit Authority* (1988), 125 Ill. 2d 230, 238.) We hold, therefore, that section 2—1303 is not unconstitutional as it applies to the CTA.

For all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

DiVITO and McCORMICK, JJ., concur.