**SEQUA CORPORATION, Plaintiff,**

v.

**LITITECH, INC. and Paul X. McMenaman, Defendants and Third–Party Plaintiffs,**

v.

**Stuart Z. KRINSLY, Bernard M. Jaffe, Gerald S. Gutterman, and Norman E. Alexander, Third–Party Defendants.**

Civ. A. No. 91–B–185.

United States District Court, D. Colorado.

Nov. 5, 1992.

Daniel J. Sears, Daniel J. Sears, P.C., Denver, Colo., for plaintiff.

Gregory R. Piche, Holland & Hart, Denver, Colo., Jerry Retherford, Anthony John-

son, J. Ronald Voss, Retherford, Mullen, Rector & Johnson, Colorado Springs, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

On May 7, 1992, defendants moved to disqualify plaintiff's local counsel, Kobayashi and Associates, and its in-house counsel, Christine Gaynor, from representing plaintiff in this diversity action. They further contend that counsels' conduct is so egregious as to warrant dismissal of plaintiff's complaint. The motion is briefed thoroughly and I heard evidence on June 21, August 1, and October 13–14, 1992. I conclude that defendants have not met their burden of showing any actual wrongdoing on the part of plaintiff's counsel. Further, under the circumstances here, I conclude that defendants have not demonstrated an appearance of impropriety under Canon 9 of the Code of Professional Responsibility. Accordingly, I will deny the motion.

In the past, defendant Lititech, Inc. provided litigation management services to plaintiff Sequa Corporation (Sequa), and defendant Paul X. McMenaman, as a licensed attorney, rendered legal services to Sequa. The relationship ended shortly after Sequa hired Christine Gaynor to be its in-house counsel in charge of litigation. In this action, Sequa sued alleging malpractice and fraud. Defendants filed a counterclaim alleging breach of contract and a third-party claim against individually named Sequa officers for intentional interference with contract.

This case has a long and tortured history punctuated by numerous bitter discovery disputes. I previously held that Lititech holds no attorney-client relationship with any of its customers. Further, the court entered orders that Sequa may interview third-party witnesses, including defendants' clients, without restriction, and compelling discovery from defendants regarding their finances, accounting, records, employee identification, client identification and case file management practices. Tenth

Circuit law requires specific findings of fact on a motion to disqualify counsel. *Fullmer v. Harper*, 517 F.2d 20, 21 (10th Cir.1975).

## I.

## FINDINGS OF FACT

Donna Lee is a legal secretary. McMenaman employed her as such and as an office administrator in his individual law practice from November, 1991 through mid-February, 1992.

On March 12, 1992, Attorney Service Center, an employment agency, assigned Lee to work as a temporary legal secretary at Kobayashi & Associates. Before that date, Lee had no contact with anyone employed at Kobayashi & Associates. Lee ended her employment there on March 13, 1992.

While entering John Kobayashi's billing time into a computer, Lee discovered that Kobayashi & Associates represent Sequa in this action against her former employer. Lee immediately stopped work and notified her supervisor at Kobayashi & Associates that she had worked for McMenaman. Her supervisor instructed Lee not to work on any matter pertaining to this case, and she informed Peggy Furgason, the paralegal assigned to this case, of Lee's former employment. Furgason then informed Cheryl Post, the attorney in charge of this case, of Lee's former employment.

Post was interested in interviewing Lee. Post considered contacting Gregory Piché, defendants' counsel, before interviewing Lee. However, she decided not to because Piché would be required to reveal the information to McMenaman. According to Post, two witnesses, John Dowling and Terry Reed Harris, had testified before to having been threatened with physical harm or legal proceedings by McMenaman. Therefore, Post concluded that effective representation of her client required an immediate ex parte interview.

Post conferred with another attorney in the office, Diane Vaksdal–Smith, about the ethical propriety of interviewing a former

employee of an adverse party. Post and Smith reviewed Colorado Bar Association Revised Ethics Opinion 69 (Revised 69) (See Appendix A). They concluded that Revised 69 authorized Post's ex parte interview of Lee as to all facts except communications protected by the attorney-client privilege. Post asked Lee if she would be willing to be interviewed. Lee consented.

Post then interviewed Lee for approximately one and a half hours. Furgason and Susan I. Strong, another Kobayashi & Associates attorney, were present during the interview. At the start of the interview, Post reviewed with Lee the provisions of Revised 69 and cautioned Lee not to reveal attorney-client privileged communications. Post assured herself that Lee understood the attorney-client privilege.

The notes of the interview, the memoranda produced by Post and Furgason, and the affidavits executed by Lee reveal that Lee discussed a variety of topics including: McMenaman's finances, assets, business practices, client identification, character, demeanor, family, office personnel, and office operations. Lee named individuals who were McMenaman's contacts with these clients. She detailed McMenaman's billing practices.

Post described Lee as talkative and willing. Post testified that she asked both open-ended and specific questions, but that Lee tended to volunteer information. Lee speculated about McMenaman's drinking habits and whether he had a sexual relationship with one of his male employees, but Post did not inquire into such topics. It was clear to Post, Strong, and Furgason that Lee was a disgruntled former employee who felt considerable rancor towards McMenaman. At the conclusion of the interview, Strong prepared preliminary drafts of two affidavits—one memorializing the full interview and one detailing the removal of a box of accounting records from McMenaman's office for use in an ongoing discovery dispute. As reflected in the interview notes and these affidavits, virtually all factual information Lee disclosed was either public information, already known, clearly discoverable, or not

otherwise subject to the attorney-client privilege.

During the course of the interview, Lee could not recall certain information, such as names, addresses, and spellings. Nobody asked Lee to obtain additional information on McMenaman, nor did anybody suggest that she do so. However, Lee was invited to "fill in the blanks" with details she later recalled. On March 13, 1992, Lee provided some of this information to Furgason, who was completing the affidavits. Furgason spoke or met with Lee a number of times to correct and revise the affidavits. Lee signed these affidavits on April 10, 1992.

Furgason testified that she was aware that Lee was obtaining some of her information from Gail Morgan, who was then a Lititech employee with whom Lee was friendly. (After March, 1992, Morgan worked for LitiSci d/b/a Lititech. Both corporations review legal fees for reasonableness). Morgan was privy to no privileged communications. At the March 12 interview, Lee had spoken of Morgan's dissatisfaction with her employment. Post indicated she would be interested in meeting Morgan if she left Lititech. Morgan was and is a Revised 69 "bystander" witness who has no authority to bind her employer to a position in this case. She has never been employed as a legal secretary by McMenaman.

On March 13 and 17, 1992, Post had telephone conferences with Gaynor regarding her interview of Lee. Post sent Gaynor a copy of Furgason's memorandum which Gaynor circulated to Sequa's general counsel, Stuart Krinsly.

On April 21, 1992, at 9:30 a.m., Chief Magistrate Judge Abram held a settlement conference in this action. At the conference, McMenaman stated that he had no financial ability to contribute to any settlement and that he was contemplating filing for bankruptcy protection. Gaynor attended this conference.

Being in Denver, Gaynor mentioned that she would like to speak to Lee to "thank her for her help." Furgason called Lee and Lee agreed to come to Post's office

after work. Furgason does not recall whether she was asked to call Lee before or after the settlement conference.

Lee arrived around 5:40 p.m. and Post introduced her to Gaynor. The three then had a drink in the atrium restaurant located in the lobby of the office building. During this time, approximately one-half hour, the three discussed many of the same topics covered during Lee's original interview, including McMenaman's finances, assets, and identity of clients. Post told Lee of McMenaman's statement at the settlement conference. Post indicated that she doubted McMenaman's profession of impecunity and that she would like to discredit the statement if it was untrue. Post and Gaynor both testified that they did not ask or suggest that Lee seek additional information. However, they did not specifically tell her not to seek additional information. Post and Gaynor both testified that they had no expectation of further contact with Lee after April 21.

After leaving Post and Gaynor, Lee went to Morgan's home for a social visit. Morgan testified that Lee discussed the subjects in which Post and Gaynor were interested. Lee asked Morgan to gather information and documents from McMenaman's office, including: names and addresses of McMenaman's children, partnership and corporate papers, financial records, addresses and phone numbers from McMenaman's rolodex, client information, and information concerning McMenaman's personal assets. Morgan told Lee that she was not sure she had access to McMenaman's office and was not sure she knew where to find such information. Although on past social occasions Lee had sought information from Morgan, this was the first time that Lee asked Morgan to get documents.

On April 22, 1992, Morgan told McMenaman of her contacts with Lee and Lee's contacts with Post and Gaynor. On April 23, 1992, Morgan met with McMenaman and Piché at his Holland & Hart offices. At that time, McMenaman and Piché engaged a private investigator, Rick Johnson, to investigate Morgan's information. They directed Johnson to conduct a surveillance of Lee's activities and to tape Morgan's telephone conversations with Lee. Several telephone conversations were, in fact, recorded without Lee's knowledge or consent.

Morgan had plans to meet Lee at a restaurant on the evening of April 23, 1992. Before that meeting, McMenaman's attorney gave her a fabricated letter to transmit to Lee. The letter was purportedly written by an attorney at another law firm. It raised questions of McMenaman's billing practices with one of his clients.

At the restaurant, Morgan gave this letter to Lee, who was very interested in it and described it as "precious." Johnson was sitting at a nearby table and saw Morgan hand the letter to Lee, but he could not overhear their conversation. Lee did not deliver the letter to any of Sequa's attorneys or agents.

While at the restaurant, Lee indicated that she wanted to go to McMenaman's office to look for documents and information herself because she knew where the files were located. Lee requested Morgan's help in the search and asked Morgan to find out when McMenaman might be out of town. Lee was specifically interested in files relating to McMenaman's clients. Morgan reported this to McMenaman and his attorney.

After the restaurant meeting, Johnson met with Morgan and debriefed her in a tape-recorded interview. Johnson asked Morgan if she believed that anyone was directing Lee's actions. Morgan responded that she did not believe so.

The next day, as directed by McMenaman and his attorney, Morgan called Lee and told her that McMenaman was leaving Monday morning. Morgan asked Lee if Sunday morning would be a good time to search his office and she replied that it would. This conversation was taped without Lee's consent.

In light of the impending search, Johnson, with McMenaman's and Piché's approval, installed video and audio surveillance equipment in the office. Johnson also marked paper in the copier with invisi-

ble ink so that any copies made could be identified if found in Kobayashi & Associates' offices. McMenaman also screened all of the documents left on the premises and was aware of the material which would remain for Lee's review and copying.

On April 26, 1992, Morgan and Lee met outside McMenaman's office at 8:00 a.m. Morgan used her key to unlock the door and the two then spent approximately 45 minutes searching for documents and information. Lee took documents and photocopies of documents, including correspondence, a blank check, bank statements, a client list, incoming and outgoing mail, rolodex cards, and client contracts.

Although Lee told Morgan that "the good stuff" would make its way to Kobayashi & Associates, Lee never transmitted any of these documents or the information contained in them to Sequa's attorneys or agents. Further, no attorney at Kobayashi & Associates was aware of Lee's intrusion into McMenaman's office.

On April 27, 1992, McMenaman, Piché, and Johnson gave Morgan a mock facsimile. The fax was ostensibly sent from McMenaman to one of his employees. It related that McMenaman anticipated closing on the sale of his Mesa County ranch on April 29, 1992, and that approximately $500,000 would be transmitted to Piché. Johnson testified that the fax was intended as "bait" to entice Sequa's counsel into receiving it. On the instructions of McMenaman and Piché, Morgan called Lee and told her of the contents of the fax. This conversation was recorded without Lee's consent.

On April 27, 1992, Lee called Post twice. In the first call, Lee expressed concern that McMenaman would harass her. Lee told Post that Morgan had seen three pages of notes on McMenaman's desk bearing Lee's name. Later that afternoon, Lee called Post and told her that Morgan had found a document in the copy machine. The document indicated that McMenaman was selling his ranch in Mesa County and transmitting the proceeds of $500,000 to Piché at Holland & Hart. Post then dictated a memorandum memorializing this conversation. Post testified that she felt "uncomfortable" receiving this information from a current McMenaman employee, but she did not stop Lee from relating it to her.

Later that evening, Lee told Morgan that the information about the ranch sale stunned Post because it was seemingly inconsistent with his statement before the magistrate that he had no assets. Lee and Morgan then arranged for Lee to pick up a hard copy of the fax.

On April 28, 1992, Morgan gave Lee a copy of the fax. At Piché's instruction, Johnson had Lee followed but she never approached the offices of Kobayashi & Associates. That afternoon, Lee called Furgason and read her the text of the fax. Lee told her that she had gotten the copy in a plain white stamped and typed envelope. Lee said she did not know if Morgan had sent it. Furgason placed the text of the fax and her conversation with Lee in a memorandum. Furgason then met with Post and Strong. Post did not mention that she had spoken to Lee the day before on the same subject. Strong testified that Post seemed surprised by the news.

Post and Strong discussed the propriety of obtaining a copy of the fax. They also questioned whether the fax was genuine or whether it was a McMenaman ploy. That same day, Post decided not to obtain a copy from Lee. Furgason's memo with the text of the fax was placed in the Sequa files.

Then, at approximately 4:00 p.m. on April 28, Johnson recorded another conversation between Morgan and Lee. During this conversation, Lee told Morgan that Kobayashi & Associates knew nothing about the office visit and had not been given any documents taken from it.

Over the next week, Post and Strong continued to discuss whether they should obtain a copy of the fax. They were concerned because, if true, the document suggested a possible fraud upon the court in light of McMenaman's representations before the magistrate judge that he had no assets. Post testified that she discussed the matter with Gaynor, but Gaynor did not recall any such discussion. Sometime in the week of May 4, 1992, Post decided to

obtain a copy of the fax to submit to the magistrate judge. Post continued to be concerned about possible fraud on the court. She was also "interested" in impeaching McMenaman. Post told Furgason to call Lee to make arrangements to obtain a copy. However, after Post learned of this motion to disqualify on May 8, 1992, she instructed Furgason to call Lee and tell her that Post did not want the fax and that Lee's phone calls were being recorded by McMenaman. Post testified that she decided not to obtain the fax because of defendants' motion to disqualify.

Throughout these events, Lee consistently told Morgan that the information was for Kobayashi and Associates. However, Lee never said that they actually received any of the documents she obtained. Morgan testified she did not think that anyone was "pulling her [Lee's] strings," but rather she was "acting on suggestions."

The nature and timing of this motion and the broad sanctions requested indicate that defendants' primary motivation here is to achieve tactical advantage. Moreover, Sequa will be deprived of counsel of its choice and suffer substantial hardship and expense by the disqualification of Kobayashi & Associates and its in-house counsel.

## II.

### CONCLUSIONS OF LAW

Control of attorneys' conduct in litigation is within the supervisory power of the trial court, and its performance in this area is a matter of judicial discretion. *EEOC v. Orson H. GYGI Co., Inc.,* 749 F.2d 620, 621 (10th Cir.1984). Indeed, district courts have an "obligation to take measures against unethical conduct occurring in any proceeding...." *FDIC v. Sierra Resources, Inc.,* 682 F.Supp. 1167, 1170 (D.Colo.1987). To guide its performance of this obligation, the District of Colorado has adopted the Colorado Code of Professional Responsibility. Local Rule 306; D.C.Colo. LR 83.6, (effective June 1, 1992). Ethics opinions of the Colorado Bar Association are advisory but they provide valuable guidance to attorneys in their conduct and

may be considered in resolving allegations of unethical conduct.

A party moving for disqualification of opposing counsel has the burden of showing grounds for such action. *Sierra Resources,* 682 F.Supp. at 1170. "Counsel cannot be disqualified on the basis of speculation or conjecture...." *Id.* The movant's burden is not met when the evidence is that the charged attorney acted with cautious regard for the disciplinary rules. *Geralnes B.V. v. City of Greenwood Village,* 609 F.Supp. 191, 193 (D.Colo.1985). Moreover, in reviewing a motion to disqualify, a court must consider whether the motion was filed to gain a tactical advantage in the litigation. *Sierra,* 682 F.Supp. at 1172. "Motions to disqualify often pose the very threat to the integrity of the judicial process that they purport to prevent. Such motions can be misused to harass opposing counsel, or to intimidate an adversary into accepting settlement...." *Gregori v. Bank of America,* 207 Cal.App.3d 291, 301, 254 Cal.Rptr. 853, 859 (1989).

> Judges must exercise caution not to paint with a broad brush under the misguided belief that coming down on the side of disqualification raises the standard of legal ethics and the public's respect. The opposite effects are just as likely—encouragement of vexatious tactics and increased cynicism by the public.

*Panduit Corp. v. All States Plastic Mfg. Co.,* 744 F.2d 1564, 1576 (Fed.1984).

### A. THE MARCH 12 INTERVIEW

Defendants argue that plaintiff's counsel violated the provisions of DR 7–104 and C.R.S. 13–90–107 by their ex parte interview of Lee, a former legal secretary of McMenaman. DR 7–104 prohibits counsel from communicating on the subject of the representation with a party he knows to be represented by counsel. Colorado Bar Association Revised Ethics Opinion 69 interprets this rule in the context of present and former employees of an adverse party. As to a present employee of an adverse party, Revised 69 permits an ex parte interview if the employee is a "bystander" witness who has no authority to bind the organization to a position in the litigation. As to a former

employee, Revised 69 allows an ex parte interview "with regard to all matters except as to communications which are the subject of the attorney-client privilege." The opinion mandates that an interviewing attorney may not inquire into privileged communications or listen while the former employee divulges privileged communications voluntarily.

Defendants contend that Sequa's counsel violated DR 7-104 in two ways. First, they contend that Lee revealed privileged communications during the March 12 interview. Second, they assert that C.R.S. 13-90-107(1)(b) prohibits an ex parte interview if the former employee was a legal secretary. I disagree on both counts.

In assessing these arguments it is crucial to remember that, although McMenaman is an attorney, he is also a party defendant in this action. Thus, the existence and scope of any privileged communication revealed by Lee can only be between McMenaman, as a lawyer and his clients, or between McMenaman, as a party defendant and his counsel at Holland & Hart.

 The attorney-client privilege protects the confidentiality of communications between an attorney and client made for the purpose of securing or rendering legal advice. *In re Grand Jury 90-1*, 758 F.Supp. 1411, 1412 (D.Colo.1991); *Geralnes B.V.*, 609 F.Supp. at 193. Here, the vast majority of the information revealed by Lee related to McMenaman as a party—his assets, finances, character, demeanor, family, and the operations and structures of his various corporations. None of this information is a *communication* between McMenaman as a client and his attorneys at Holland & Hart for the purpose of obtaining or rendering legal advice. Nor was the fake fax privileged. It purported to be a communication between McMenaman and one of his employees concerning McMenaman's assets. Furthermore, these matters are either the approved subjects of discovery orders entered in this case or they may, under the circumstances, be inquired into pursuant to the federal rules of civil procedure. In the context of this case, this information is not privileged.

Lee also disclosed information relating to the identity of McMenaman's clients, including contact persons, his relationship with those clients, his billing practices, and his legal bill from Holland & Hart for defense of this action. However, the identity of clients and matters relating to fees are not privileged. *In re Grand Jury Subpoenas*, 906 F.2d 1485, 1489 (10th Cir.1990). In addition, there is no evidence of disclosed privileged communications between McMenaman and his clients. Finally, although defendants claim that Lee disclosed proprietary trade secret information to Kobayashi & Associates, their evidence does not support that claim.

In short, whether Lee had personal knowledge of the information she related to Sequa's counsel or received it through Morgan, the information is not privileged. Therefore, I conclude defendants have not met their burden of showing that Lee divulged any communications protected by the attorney-client privilege.

 Defendants also argue that the Colorado statutory attorney-client privilege establishes a blanket prohibition against ex parte interviews of former legal secretaries. C.R.S. 13-90-107(1)(b) provides in relevant part:

... nor shall an attorney's secretary, paralegal, legal assistant, stenographer, or clerk be examined without the consent of his employer concerning any fact, the knowledge of which he has acquired in such capacity.

The Colorado Supreme Court has said that "the statute can only be reasonably interpreted as extending the privilege to an attorney's employees if the attorney is also so privileged." *People v. Silvola*, 190 Colo. 363, 547 P.2d 1283, 1288, *cert. denied*, 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167 (1976). Thus, an attorney's consent to the interview of his former legal secretary is required only when privileged information is sought. If a party to an action seeks only non-privileged information from a former legal secretary of an adverse party to that action, the provisions of Revised 69 operate to permit the ex parte interview.

Here, Lee did not disclose privileged communications between McMenaman and his clients or between McMenaman and his counsel. Therefore, McMenaman's consent was not required before plaintiff's counsel interviewed her. Sequa's counsel were guided by Revised 69. They scrupulously followed its teachings and should not be disqualified for doing so. *See, Geralnes B.V.*, 609 F.Supp. at 193. If there is fault to be found in their interview of Lee, the fault lies with Revised 69, not them. I conclude that plaintiff's counsel violated neither DR 7–104 nor C.R.S. 13–90–107(1)(b) by seeking non-privileged information from McMenaman's former legal secretary.

## B. THE OFFICE ENTRY

■ Defendants allege that plaintiff's counsel violated several disciplinary rules when they expressly or tacitly "dispatched" Lee on an information gathering mission. These rules include (1) DR 1–102(A)(2), (using another to circumvent a disciplinary rule), (2) DR 1–102(A)(4), (engaging in conduct involving dishonesty), (3) DR 1–102(A)(5), (engaging in conduct that is prejudicial to the administration of justice), and (4) DR 7–102(A)(8), (knowingly engaging in illegal conduct or conduct contrary to a disciplinary rule). Defendants maintain that Lee's conduct violated several Colorado criminal laws, such as burglary, trespass, and theft. They argue that Sequa's counsel is accountable for these violations because they used Lee to gather this information for them and took no steps to control her.

There is no evidentiary basis to support these claims. Sequa's counsel did not instruct Lee to obtain additional information. They did not suggest or encourage Lee to do the things she did. They did not even know that Lee had entered McMenaman's offices and had taken documents from it. For some reason known only to Lee, she took it upon herself to seek information in which Post and Gaynor had expressed interest by arranging entry into McMenaman's office. Simply put, Lee was a loose cannon on the deck. Sequa's counsel cannot be held responsible for her reprehensi-

ble but unforeseeable conduct. It should go without saying, then, that they had no obligation to control her unforeseeable conduct. It is unimaginable that counsel should be required to instruct a witness properly interviewed *not* to do the things Lee did here. Therefore, I conclude plaintiff's counsel did not engage in *conduct* violating any of the disciplinary rules cited above.

## C. THE FAKE FAX

■ Defendants also maintain Sequa's counsel violated the same disciplinary rules cited above by "accepting" the contents of the fake fax, knowing that it came from a current employee of McMenaman. Defendants rely on Colorado's wiretapping statute, C.R.S. § 18–9–303, which provides in relevant part:

(1) Any person not a sender or intended receiver of a telephone or telegraph communication commits wiretapping if he:

(a) Knowingly overhears, reads, takes, copies, or records a telephone, telegraph, or electronic communication without the consent of either a sender or a receiver thereof or attempts to do so;

(c) Knowingly uses for any purpose or discloses to any person the contents of such communication, or attempts to do so, while knowing or having reason to know the information was obtained in violation of this section.

As to sub-section (a), Sequa's counsel did record the contents of the fax. However, Lee learned of the information in the fax after the electronic communication was reduced to a paper copy. Criminal statutes are narrowly construed. Under a narrow construction of the statute, it is not wiretapping to record the content of an electronic communication when the information is gleaned from a hard copy of a received and completed communication. Even assuming a broad construction, counsel's conduct in recording the information volunteered by Lee is not so egregious as to warrant disqualification. Sequa's counsel did not seek this information; it fell into their laps. They recorded it in a memo as a

matter of course until they could decide what to do with it. Moreover, Lee did not act on the instructions or encouragement of Sequa's counsel and, therefore, Lee's violation of this statute, if any, cannot be imputed to them. I conclude that plaintiff's counsel acted in good faith. Their conduct did not involve dishonesty and was not prejudicial to the administration of justice.

As to sub-section (c), Sequa's counsel did not use or disclose the contents of the fax. Although they contemplated disclosing it to the magistrate judge, their reason for doing so was tempered in large part by their concern for the integrity of his office. Consequently, they did not violate any disciplinary rule by "accepting" Lee's transmittal of the fax's contents.

Further, under my reading of Revised 69, Sequa's counsel could have interviewed Morgan and obtained this same non-privileged information directly from her. Morgan has no authority to bind defendants in this action and, therefore, she is a bystander witness who could be interviewed ex parte. Therefore, I conclude that plaintiff's counsel did not violate any disciplinary rule when Lee voluntarily disclosed the contents of the fake fax.

## D. THE APPEARANCE OF IMPROPRIETY

■ Lastly, defendants argue that, under the totality of circumstances here, counsel's conduct created an appearance of impropriety in violation of Canon 9 of the Code of Professional Responsibility. I disagree.

In *Food Brokers, Inc. v. Great Western Sugar Co.*, 680 P.2d 857, 858–59 (Colo.App. 1984), Colorado adopted the majority test for disqualification under Canon 9:

> To warrant disqualification under Canon 9 of the Code of Professional Responsibility there must be a showing of reasonable possibility that some specifically identifiable impropriety occurred and the likelihood of public suspicion must be weighed against the interest in retaining counsel of one's choice.

The focus of the inquiry is on public confidence in the legal system. *Osborn v. District Court*, 619 P.2d 41, 45 (Colo.1980). Under this test, disqualification may be proper even if there is no actual violation of a disciplinary rule. *Id.* The Tenth Circuit has recognized that Canon 9 alone can be the basis for disqualification in appropriate circumstances. *U.S. v. Troutman*, 814 F.2d 1428, 1442 (10th Cir.1987). However, the Tenth Circuit cautions that:

> The general language of Canon 9 cannot be construed as a failsafe for a claim of ethical violation where none is found under the specific canons or disciplinary rules applicable to the case at bar. Although courts have not foreclosed the possibility of disqualification under Canon 9 alone, they are reluctant to disqualify a lawyer under Canon 9 when none of Canons 1 through 8 were violated.

*Id.*

Other courts have also cautioned against the use of Canon 9 as grounds for disqualification.

> Canon 9 ... should not be used promiscuously as a convenient tool for disqualification where the facts simply do not fit within the rubric of other specific ethical or disciplinary rules.

*Optyl Eyewear Fashion International Corp. v. Style Companies*, 760 F.2d 1045, 1049 (9th Cir.1985). Moreover, "an attorney's conduct should not be governed by standards that can be imputed only to the most cynical members of the public." *Church of Scientology v. McLean*, 615 F.2d 691, 693 (5th Cir.1980).

Here, defendants have proved no actual violation of the disciplinary rules. Defendants' allegations and circumstantial evidence do no more than give rise to suspicion, speculation, and conjecture that some specifically identifiable impropriety occurred. Thus, the first prong of the *Food Brokers* test is not satisfied.

Defendants point to the events of April 21 and Lee's later entry into McMenaman's office as creating a likelihood of public suspicion. In assessing whether this evidence raises the likelihood of public suspicion, I must focus on the conduct of *coun-*

*sel* and not on the outrageous conduct of Lee. The question is whether counsel's conduct was such that it raises the suspicion that they somehow participated in or caused Lee's activities.

I conclude that the likelihood of public suspicion, if any, does not outweigh plaintiff's interest in retaining counsel of its choice. Only the most cynical member of the public would look at the actions of Sequa's counsel and conclude that their conduct creates the appearance of impropriety. Reduced to basics, all that Sequa's counsel did here was to interview a witness and buy her a drink. I will not disqualify Sequa's counsel of choice for the conduct of a rogue witness. Therefore, disqualification under Canon 9 is not appropriate.

This conclusion is buttressed by the conduct of defendants and their counsel in prosecuting this motion. Upon learning of Lee's contact with Sequa's counsel, defendants and Piché embarked on a course raising independent questions as to their conduct. In their zeal to prove a factual basis for disqualification *and dismissal,* they engaged a private investigator who recorded phone conversations without the requisite consent and set up an elaborate "sting" operation trusting that documents taken from McMenaman's offices would find their way to Kobayashi & Associates. Defendants and Piché fabricated documents to entice Sequa's counsel into accepting them and, thereby, commit an ethical violation warranting disqualification and the imposition of other sanctions.

McMenaman and Piché did not contact the police, the district attorney, or the United States attorney when they first learned of Lee's activities and her proposal to enter McMenaman's offices. Instead, they commenced their own surreptitious investigation in the hopes of proving an ethical violation warranting disqualification and dismissal.

Law enforcement authorities are afforded license to engage in unlawful or deceptive acts to detect and prove criminal violations. Private attorneys are not. Under Colorado's Code of Professional Responsibility, it is a violation of DR 1-102(A)(4) for an attorney to record conversations without consent of the other party. *People v. Smith,* 778 P.2d 685, 687 (Colo. 1989); *People v. Selby,* 198 Colo. 386, 606 P.2d 45, 47 (Colo.1979).

> The undisclosed use of a recording device necessarily involves elements of deception and trickery which do not comport with the high standards of candor and fairness to which all attorneys are bound.

*Smith,* 778 P.2d at 687.

The *Smith* court also rejected application of the "prosecuting attorney" exception to a private attorney. That exception recognizes that state or federal prosecuting attorneys and other law enforcement officials may make use of secret recordings to detect and prove criminal violations. *See,* ABA Ethics Opinion 334. McMenaman and Piché are neither prosecuting attorneys nor law enforcement officials and, therefore, they cannot justify their conduct with this exception. Further, I refuse to extend the prosecuting attorney exception to the facts before me. To do so would effectively encourage vigilante investigations and denigrate the dignity of the judicial process. Although I believe that McMenaman and Piché originally embarked on this course of conduct in good faith, their zeal in obtaining an advantage in this case blinded them to the ethical implications of their actions and other responsible courses of conduct open to them.

### E. CONCLUSION

Sequa has expended considerable resources in prosecuting this action through counsel of its choice. Defendants prove no basis for disqualification of Sequa's counsel, much less dismissal of Sequa's claims. Indeed, the sanctions sought in light of the facts before me lead to the inescapable conclusion that this motion is pressed for tactical advantage.

> [L]itigation is not a game of hare and hounds where rules are easily bent, where truth is skirted by lies and evasions and cheap victory is sought at the expense of fairness and candor. Even if the cynics are correct in saying that such

practices are endemic to the system, it is necessary to say in this case that they will not be tolerated.

*Schmidt v. Ford Motor Company,* 112 F.R.D. 216, 221 (D.Colo.1986). Far from increasing the standards of legal ethics and public respect in the system, granting this motion would have the opposite effect.

Accordingly, IT IS ORDERED THAT defendants' motion to disqualify plaintiff's counsel and dismiss this action is DENIED.

## APPENDIX A

### Ethics Committee Opinions

### CBA Revised Ethics Opinion No. 69:

### Communicating With the Employee

### Or Former Employee of an

### Adverse Party Organization

*Adopted June 20, 1987*

**Editor's Note:** The following CBA Ethics Opinion No. 69 replaces in its entirety the original Opinion No. 69, published in the July 1985 issue of *The Colorado Lawyer* at page 1225.

## INTRODUCTION AND SCOPE

The Ethics Committee is aware of a great · concern by members of the Bar about the propriety of communicating with the employee or former employee of an adverse party organization. This opinion is being offered in order to provide guidance in this area of concern. It is intended to cover not only the situation where attorneys wish to communicate with the employee of an organization that is named as a party, but also to those situations where there is actual knowledge of representation prior to litigation. This opinion does not address the scope of the attorney-client privilege, the persons protected thereunder, or the limitations on *ex parte* contacts that flow therefrom. *See, Upjohn Co. v. U.S.,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *Wright v. Group Health Hospital,* 103 Wash.2d 192, 691 P.2d 564 (1984).

## SYLLABUS

When deciding whether or not to communicate with a current employee of an organization named as a party, which organization the lawyer knows to be represented on the subject matter of his communication, the lawyer should obtain the prior consent of the lawyer representing that organization in that matter unless the employee is or was solely a bystander witness, or unless the communication is otherwise permitted by law.

A current employee is not a bystander witness if he or she has the authority to commit the organization to a position with regard to the subject matter of the representation. The employee's authority may emanate from his or her position as an officer or manager of the organization; or because the employee's acts, omissions, or statements may be imputed to the organization as a matter of law.

All other current employees are bystander witnesses and may be contacted without the consent of the organization's attorney.

An attorney does not avoid the requirement of obtaining the prior consent of the organization's lawyer by directing another to communicate with the organization's current employee.

An attorney may interview a former employee *ex parte* with regard to all matters except as to communications which are the subject of the attorney-client privilege.

## OPINION

The disciplinary rule in question is DR 7–104(A)(1), which provides as follows:

Communicating With One of Adverse Interest

(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

The purpose of DR 7–104(A)(1) is to prevent the deprivation, undermining, or by-passing of a client's right to the advice of counsel. *In re: McCaffrey,* 275 Or. 23, 549 P.2d 666 (1976); *see also,* Code of Profes-

sional Responsibility EC 7–18 (1977). An attorney's advice to his or her client includes explaining the law for the client's best interests; protecting the client against unfair and misleading settlements; correcting errors in the client's communication; protecting the client against self-prejudice; and preserving the client's right to privileged communications. *See, Abeles v. State Bar*, 9 Cal.3d 603, 510 P.2d 719, 108 Cal.Rptr. 359 (1983); *see also*, ABA Canons of Professional Ethics Canon 9 (1908).

In other words, the purpose of DR 7–104(A)(1) is to prevent opposing counsel from impeding an attorney's performance for his or her client. ABA Comm. on Professional Ethics and Grievances, Formal Op. 108 (1934); *see also*, Leubsdorf, "Communicating With Another Lawyer's Client: The Lawyer's Veto and the Client's Interests," 127 U.Pa.L.Rev. 683 (1979); Kurlantzik, "The Prohibition on Communication With an Adverse Party," 51 *Conn.B.J.* 136 (1977); *Note*, DR 7–104 of the Code of Professional Responsibility Applied to the Government 'Party,' " 61 *Minn.L.Rev.* 1007 (1977); *Annot.*, 1 A.L.R.3d 1113 (1965).

The commentators who favor a broad application of the rule reason that the imbalance in knowledge and skill between a lawyer and a lay adverse party may cause even well-intended acts of the lawyer to have a coercive impact on the party and to induce a party to disclose privileged information. Others argue that the information that a lawyer obtains from unrepresented adverse parties often leads that lawyer to dilute his or her zeal for pursuing the client's claim. Thus, the conflict exists between one's right to receive and be protected by the advice of one's attorney and a client's interest in a quick and inexpensive exploration of a potential legal claim.

Because of this conflict, the Code has admittedly been interpreted in such a way so as to create great confusion. *See*, ABA, *Annotated Code of Professional Responsibility* 336 (1979).

The rule can be broken down into five parts:

1. "Communication."
2. "Subject of the Representation."
3. "Party."
4. "Knows" to be represented.
5. "Authorized by law" to communicate without prior consent.

"Communication" is that made either by the attorney or his or her agent because of the phrase "causes another to communicate." ABA Comm. on Professional Ethics, Informal Op. No. 663 (1963). This includes causing one's client to communicate directly with the opposing party. ABA Comm. on Professional Ethics and Grievances, Formal Op. 75 (1932).

Furthermore, whenever an attorney is going to communicate with a witness, he or she should identify himself or herself and the reason for the interview. ABA Comm. on Professional Ethics and Grievances, Formal Op. 117 and 118 (1934); ABA Comm. on Professional Ethics, Informal Op. 908 (1966); *see also, Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268 (2d Cir. 1975). There are several reasons for this. The rule's purpose of preserving and promoting a person's right to the advice of his or her attorney will be undermined because a person will be less likely to utilize counsel if he or she is unaware that the questioner is the representative of a potentially adverse party. This nondisclosure of identity and purpose might also be viewed as a false statement of fact violating Code of Professional Responsibility DR 7–102(A)(5) (1977); or conduct involving deceit or misrepresentation violating Code of Professional Responsibility DR 1–102(A)(4) (1977). Such anonymity could also create the appearance of impropriety violating Code of Professional Responsibility Canon 9 (1977). For these and other reasons, a trial court has even excluded a defendant's statement to the plaintiff's investigator because the defendant believed that the investigator was sent by his own attorney. *Trans–Cold Express, Inc. v. Arrow Motor Transit, Inc.*, 440 F.2d 1216 (7th Cir.1971).

The parameters of the group protected by DR 7–104 differ in material respects from those who are clients entitled to the attorney-client privilege. *Upjohn Co. v. U.S.*, 449 U.S. 383, 101 S.Ct. 677, 66

L.Ed.2d 584 (1981); *Wright v. Group Health Hospitals,* 103 Wash.2d 192, 691 P.2d 564 (1984). One should also consult *American Protection Insurance Co. v. MGM Grand Hotel–Las Vegas, Inc.,* No. CV–LV–82–26–HDM (D.Nev. March 11, 1986).[1]

The phrase "subject of the representation" concerns the matter in which the interviewing counsel is representing his or her client. If the interviewing lawyer is communicating with the opposing party regarding a matter outside the interviewing lawyer's representation, then there would be no violation of the rule; or, if the questioning lawyer knows that the opposing party is represented by a lawyer, but knows that such representation is on a totally unrelated matter, then such communication would not be a violation.

Where the interviewing lawyer knows that the opposing party is represented by an attorney but he or she is unclear about the area of that representation, he or she is best advised to check with that lawyer before commencing the communication. *See, State v. Yatman,* 320 So.2d 401 (Fla.Dist. Ct.App.1975), where a criminal defendant was represented by counsel in an existing criminal case and the prosecutor's attempt to interview that defendant for the purpose of filing a separate case based on the same criminal episode was found to have been an improper attempt. *See, Abeles v. State Bar,* 9 Cal.3d 603, 510 P.2d 719, 108 Cal. Rptr. 359 (1973), where California ruled that where a party had counsel of record, the attorney could not communicate with that party without the consent of the counsel of record, even where the client denied being represented personally by counsel of record; and, *In re: Schwabe,* 242 Or. 169, 408 P.2d 922 (1965), where an attorney was reprimanded for contacting a party directly to determine if he was in fact represented by another attorney who had so notified him of such representation. Thus, if there is any question about whether the representation of a party is for the subject matter of the communication, it is advisable to contact the purported counsel for that party in order to determine the nature of that representation, if any, before proceeding.

This leads to the next part of the Rule: "[K]nows" (the party) to be represented by a lawyer in that matter...." "[K]nows" means information of representation received by direct verbal or written communication or by constructive notice from the pleadings. Constructive notice beyond that existing in the pleadings does not constitute knowledge.[2] The reason is that this Rule, unlike several other rules in the Code of Professional Responsibility, does not include terms such as the following: "should know,"[3] "it is obvious,"[4] or "under circumstances where."[5]

Therefore, even though one has indirect or general knowledge of legal representation, such as insurance carriers generally having legal counsel, there is no duty to inquire if a party has legal counsel in the specific matter in question.[6]

"Authorized by law" simply means that which is authorized by statute, rule or order of court, and most probably the rule of any administrative agency having jurisdiction over the case. *Weinstein v. Rosenblum,* 59 Ill.2d 475, 322 N.E.2d 20 (1974).

Regarding the meaning of the word "party," since the perceived potential for harm to the attorney-client relationship is not dependent upon the existence of a civil action, the protection of DR 7–104(A)(1) is not solely dependent upon the organization being named in litigation. The organization should be considered a party anytime it has specifically retained counsel to represent its interests regarding the subject of representation or has specifically referred the matter to house counsel. *See,* Model Rules of Professional Conduct, Rule 4.2 comment (1980).

Once it has been determined that an organization is a party under DR 7–104(A)(1), it should be determined which persons within that organization constitute the party, and which individuals are bystander witnesses.

Employees who constitute the party are differentiated from those who are bystander witnesses by their authority to commit the organization to a position regarding the

subject matter of representation. If the employee is "in a position to commit the municipal corporation in the particular situation because of his authority or because for some other reason the law cloaks him with authority, then he, as the alter ego of the corporation, is a party for purposes of DR 7–104(A)(1)." ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1377 (1977); *accord,* ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1410 (1978); *contra,* Tenn. Ethics Opinion 82–F–27 (1982).

An additional guideline as to which employees of the organization constitute the party is found in the comment to Rule 4.2 of the ABA Model Rules of Professional Conduct [the language of the rule is substantially identical to DR 7–104(A)(1)]. The comment prohibits contact "with persons having managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for the purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization," Model Rules of Professional Conduct Rule 4.2 comment (1980).

It should be noted that not all managerial employees are "parties." The protection of DR 7–104(A)(1) is limited to those managerial employees with authority to commit the organization to a position regarding the subject matter of representation. An example of the type of employees who could commit the organization to a position is one whose duties include making litigation decisions or whose duties include answering the type of inquiries posed.

Managerial employees with the authority to commit the organization to a position, but not with respect to the subject matter of representation, would not be considered parties. Likewise, employees whose acts, omissions or statements are imputed to the organization, but not with respect to the subject of representation, are not protected. Thus, a president of a corporation who does not have decision-making authority regarding the subject matter of representa-

tion would not be protected by DR7–104(A)(1) (unless his or her acts, omissions or statements regarding the subject of representation would bind the corporation). All other current employees are bystander witnesses and not protected by DR 7–104(A)(1).

In the case of *In re: FMC Corp.,* 430 F.Supp. 1108 (S.D.W.Va.1977), the court limited the word "party" within a corporation to the president, chairman of the board, and plant managers. In ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1377 (1977), a building marshall who had complete authority, including police power, to inspect, require correction and enforce the building code could not be contacted regarding his conclusions as to the cause of a structural failure of a sewer line. On the other hand, it was permissible for an attorney for a person injured by falling on a slippery store floor to interview the store clerks who witnessed the accident, ABA Comm. on Professional Ethics and Grievances, Formal Op. 117 (1934).

The distinction between bystander and non-bystander witnesses does not apply to an organization's former employees. After leaving the organization's employ, a former employee cannot bind the organization as a matter of law. *See, e.g.,* Rule 801(d)(2)(D), C.R.E.; 4 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(D)[01] at 801–222 n. 16 (1985); *Securities and Exchange Commission v. Geon Industries, Inc.,* 531 F.2d 39, 43 n. 3 (2d Cir.1976). As a former employee is thus not the "party," *i.e.,* the organization, an attorney does not violate DR7–104(A)(1) by communicating directly with the organization's former employee about the substantive dispute without the prior consent of the organization's counsel. *Wright v. Group Health Hospital,* 103 Wash.2d 192, 691 P.2d 564, 569 (1984); *see also, American Protection Insurance Co. v. MGM Grand Hotel–Las Vegas, Inc.,* No. CV–LV–82–26–HDM (D.Nev. March 11, 1986) (discussing who may be contacted *ex parte,* when the *ex parte* contact may occur, and the consequences arising from improper *ex parte* contacts) *(see,* n. 1, *supra ).* However, as

discussed above, DR7–104(A)(1) is designed in part to preserve the confidentiality of privileged attorney-client communications. Accordingly, the inquiring attorney may not, while communicating with the organization's former employee, inquire into privileged attorney-client communications; nor may the inquiring attorney listen while the former employee attempts to divulge privileged communications voluntarily. Any privilege existing between the former employee and the organization's counsel belongs to the organization, and can be waived only by the organization. *See, A. v. District Court,* 191 Colo. 10, 550 P.2d 315, 323 (1976), *cert. denied,* 429 U.S. 1040 (1977).

In conclusion, then, a current employee of an adverse party organization who has authority—as described above—to commit the organization to a position with regard to the subject matter of the communicating attorney's representation, may not receive communication from the adverse party's counsel or his agent without the consent of the organization's attorney. A former employee of an adverse party organization may be interviewed *ex parte* with regard to all matters except as to communications which are the subject of the attorney-client privilege.

1. For the convenience of the bar, copies of this unpublished opinion may be obtained from the Colorado Bar Association.

2. *See,* CBA Ethics Comm., Formal Op. 64, Colorado Ethics Opinions, 1985 supplement, in which indirect information of an ethical violation does not constitute sufficient "knowledge" for an attorney to be required to report that violation. Certainly, a stronger word like "knows" requires an even lesser duty, especially when one can expect a party to inform him whether or not he or she is represented.

3. Code of Professional Responsibility DR 6–101 (1977).

4. *Id.* at DR 2–109, DR 5–101, DR 2–110, DR 5–102, DR 7–102 and DR 8–101.

5. *Id.* at DR 8–101(A)(1).

6. Based on the preceding discussion of "subject matter," if one has direct information, not indirect general knowledge, that the opposing party is represented by a lawyer and he or she is uncertain whether that representation extends to the subject matter of the communi-

cation, the safest course is to establish the scope of the representation and/or the communication with the lawyer before communicating.