TRANS–COLD EXPRESS, INC., a Texas Corporation, and Valley Leasing Co., Inc., a Texas Corporation, Plaintiffs and Counter-defendants and Appellants,

v.

ARROW MOTOR TRANSIT, INC., an Illinois corporation, Defendant and Counter-plaintiff and Appellee,

and

Thomas MAXWELL, Plaintiff and Appellee,

v.

TRANS–COLD EXPRESS, INC., a Texas corporation, Defendant and Appellant.

No. 18200.

United States Court of Appeals, Seventh Circuit.

March 19, 1971.

Lawrence H. Eiger, Martin E. Litwin, Jerome H. Torshen, Chicago, Ill., for appellants; Litwin & Sapoznick, Jerome H. Torshen, Ltd., Chicago, Ill., of counsel.

Howard & French, Chicago, Ill., for appellees; Richard G. French, Stuart N. Litwin, Gary E. Dienstag, Chicago, Ill., of counsel.

Before KILEY, PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

At about 5:15 A.M. on July 26, 1966, as a tractor-trailer being driven by Shirley Cole was turning off U.S. 30 into the Hi-De-Ho Truck Stop, it was hit from behind by another large unit driven by Thomas Maxwell. Both vehicles were overturned and suffered substantial damage; both drivers were injured and each claimed the other was at fault. In the litigation which ensued, the jury believed Thomas.[1]

Appellants contend that the jury would have believed Shirley if the court had admitted into evidence (1) the transcript of their investigator's interview with Thomas's father, which included comments by Thomas; and (2) the testimony of an accident reconstruction expert. We have concluded that the trial court properly rejected both offers.

Many of the facts are uncontradicted. Shirley worked as a relief driver for her husband, who owned the tractor she was driving. She had been driving a tractor-trailer for about a year or a year and a half. She was unfamiliar with U.S. 30. On the morning of the accident, with the exception of a short break at about 3:00 A.M., she had been driving steadily for about four and one-half hours when the accident occurred. Her husband had been asleep since shortly after they picked up a refrigerated trailer in Muncie, Indiana. They had been on the road quite steadily, taking alternate turns at driving and resting in the "sleeper," for an undetermined number of days after leaving California and prior to the collision.

Thomas was on his regular run, making the turn between Fort Wayne and Chicago. He had been driving heavy units for six years. He lived in Plymouth, Indiana, only a few miles from the truck stop, and had worked there before he became a driver at age 18. On the morning of the accident his trailer was loaded at Warsaw, Indiana, only 25 or 26 miles away. He was paid by the mile rather than the hour (he testified that he was driving at 55 miles per hour, the speed limit for trucks on U.S. 30).

The witnesses agreed that Shirley had overtaken Thomas shortly before he reached the Hi-De-Ho. The conflict in the testimony related primarily to the place where she passed him and how fast they were going. According to Shirley, about three and one-half to four miles east of the Hi-De-Ho she saw Thomas's unit which was traveling at about 45 miles per hour. She passed Thomas, driving about 55, and had returned to the right-hand lane about three-quarters of a mile before reaching the truck stop. She slowed without immediately braking, and noticed that

---

1. Trans-Cold Express, Inc., the lessee of the tractor driven by Shirley, and Valley Leasing Co., Inc., owner of the refrigerated trailer, filed a complaint against Arrow Motor Transit, Inc., Thomas's employer, on August 4, 1967. Arrow counterclaimed. Thomas subsequently filed a separate action against Trans-Cold, which was later consolidated with the first case. Thomas recovered a judgment of $35,000 and his employer recovered $19,801.46.

Thomas was "a good distance" behind her when she first put on her turn signals. The turn signals were on for about three-quarters of a mile. She had slowed to about six miles per hour and was completing her turn when her trailer was struck by Thomas's cab.

Thomas testified that Shirley was only about three-quarters of a mile from the truck stop when she came up from behind; that he was doing 55 and she must have been traveling 10 or 15 miles faster; that they had almost reached the Hi-De-Ho before she returned to the right-hand lane after passing him; that she was only a few feet ahead of him when her brake lights went on; then "* * * I stomped on my pedal, my brake pedal, with both feet and pulled my hand valve, and tried to pull to the left, * * * there was an impact, and that is the last thing I remember."

## I.

■■ The case was tried in the Federal District Court for the Northern District of Illinois. Federal jurisdiction was predicated on the diverse citizenship of the parties. See 28 U.S.C. § 1332. Although the accident occurred in Indiana, in both the trial court and in this court the parties have relied on Illinois evidence law. In their reply brief, however, appellants for the first time advanced the argument that Rule 43(a) of the Federal Rules of Civil Procedure is a

"rule of admissibility, not exclusion," and that even if the proffered evidence was properly excluded under Illinois law, it was admissible as a matter of federal law.[2] We are satisfied that Rule 43(a) is applicable here.[3] Under that rule, we ordinarily look first to the law of the forum state, in this case Illinois, and then to federal law.

With regard to the admissibility of the transcript of the investigator's interview, the exercise of the trial court's discretion is supported both by the Illinois authority cited by appellees and by our conception of proper practice in federal courts. Admissibility of the proffered expert testimony is within the sound discretion of the trial judge under both the Illinois and the federal cases. We are unwilling to assume that he would have exercised his discretion differently if the federal authorities cited to us by appellants' new counsel had been urged below.

## II.

On July 2, 1968, an investigator employed by appellants interviewed Archie Maxwell (Thomas's father) in the presence of Thomas. Both Maxwells were employed by appellee, and the litigation had already been commenced.[4] Indeed, appellants had already deposed Thomas. They gave no notice of the interview to opposing counsel, and no lawyer was present. The transcript of the inter-

---

2. Rule 43(a) provides in pertinent part:
   "All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made."

3. See Pasternak v. Pan American Petroleum Corp., 417 F.2d 1292 (10th Cir.

1969); Monarch Insurance Company v. Spach, 281 F.2d 401 (5th Cir. 1960); 5 Moore's Federal Practice, ¶ 43.04, pp. 1343–46; compare Palmer v. Fisher, 228 F.2d 603 (7th Cir. 1955), cert. denied sub nom, Fisher v. Pierce, 351 U.S. 965, 76 S.Ct. 1030, 100 L.Ed. 1485 overruled on other grounds, Carter Products, Inc. v. Eversharp, Inc., 360 F.2d 868 (7th Cir. 1966).

4. The litigation between the owners of the vehicles was commenced on August 4, 1967. For the purpose of our decision we assume that Thomas's separate suit for personal injuries had not yet been filed, although it was obviously anticipated since he had suffered severe personal injuries and his employer contended Shirley was at fault.

view makes it perfectly clear that the Maxwells were under the impression that the investigator was a representative of their employer.[5]

During the course of the interview, Archie Maxwell expressed the opinion that the connection between Thomas's tractor and trailer was defective, and that without the defect Thomas could have avoided the accident.[6] Thomas remained silent during several comments by Archie expressing this opinion. In addition, after Archie had stated that the tractor manufacturer was responsible for the defect, Thomas explained that he had made a separate settlement with the manufacturer.[7]

The case was tried about a year after the statement was taken. In the interim appellants took a second deposition of Thomas and also deposed his father. The statement was not used at either deposition. A fair reading of the record indicates that its existence was not made known to the appellees in advance of trial notwithstanding the entry of a pre-trial order requiring the parties "* * * to advise each other in writing of documents to be offered in evi-

dence at the trial on or before April 20, 1969, * * *"[8]

Appellants contend that the transcript of the interview was admissible for impeachment purposes and as substantive evidence. The record indicates that the trial court excluded the statement largely because he was offended by the investigator's deception and trial counsel's tactics. Appellants argue that such considerations are subordinate to the paramount interest of ascertaining the truth.

We shall identify only three reasons which adequately support the exercise of the trial judge's discretion.

*First,* we share his unfavorable reaction to the deceptive manner in which the evidence was obtained,[9] and to its subsequent nondisclosure. Entirely apart from the possible probative value of the statement, the desirability of deterring improper investigative conduct was a factor which the court could properly consider in the exercise of its discretion to exclude the evidence. *Cf.,* Elkins v. United States, 364 U.S. 206, 216–18, 80 S.Ct. 1437, 4 L.Ed.2d 1669; Bruske v. Arnold, 100 Ill.App.2d 428, 241 N.E.2d 191 (3rd Dist. 1968), af-

---

5. After Archie Maxwell expressed the opinion that the fifth wheel "wasn't properly mounted," Thomas said, "I don't think the other side knows that." App. 297. Later Archie said, "The other company don't know anything about the fifth wheel or the tandem coming out from under it." App. 298. The transcript contains no false statement by the investigator, but unquestionably he was aware of the Maxwells' mistaken understanding of his true capacity.

6. "Someone had left the pin out of the trailer. There was no pin in the back.
"Q. Did you see this at the scene?
"A. Yes. After I went to the hospital. After they got it towed away, I took pictures of the rig. I will tell you the truth, if the tandem hadn't come out, he would have missed her. When the air line broke, he didn't have nothing." App. 296.

7. "I have an agreement if I don't sue International Harvester, I have a lifetime job. That is why I didn't sue them." App. 297.

8. There is a dispute as to whether or not appellees knew of the existence of the statement. For example, appellants cited us to page 231 of the Appendix to support their assertion that "* * * defendants' counsel again acknowledged that they had been informed of the existence of the statement during the aforementioned pre-trial conference." On that page, however, defendants' counsel is quoted as saying: "We had no knowledge whatsoever of the existence of this statement, your Honor."

9. "We see no impropriety in a bona fide attempt to ascertain the truth as to the condition of the floor by questioning the clerks in the store who are supposed to have knowledge of the essential facts, *provided no deception is practiced in obtaining their statements and they are informed that the person interviewing them is the attorney for the claimant or represents him.*" (Emphasis added.) Opinion 117 of the American Bar Association Committee on Professional Ethics and Grievances, August 27, 1934.

firmed 44 Ill.2d 132, 254 N.E.2d 453 (1969); see also, Cataphote Corp. v. Hudson, 422 F.2d 1290, 1296 (5th Cir. 1970).[10]

*Second,* the statement did not impeach Thomas. We find no conflict whatsoever between Thomas's direct testimony and anything said by either Archie or Thomas in the interview. On the contrary, the transcript corroborates the substance of Thomas's testimony. While talking confidentially to a person thought to be a friend, both Thomas and Archie placed the blame on Shirley.[11]

Moreover, the fact that Thomas had received valuable consideration in the settlement of a possible claim against the manufacturer was collateral to his direct testimony at trial. It would have a minor effect, at best, on his credibility which was already subject to discount because of his interest in the outcome.

*Third,* to the extent that Archie's self-styled expertise revealed a manufacturing defect as a possible contributing cause, appellants had ample opportunity in advance of trial to substantiate this theory with admissible evidence if in fact the theory was valid. They attempted to develop this point during cross-examination of Thomas by asking if he heard a bump immediately before the impact and thereafter impeaching his denial. This is not an appropriate way to develop a serious explanation of the cause of an accident.

Appellants' basic argument is that the overriding importance of disclosing the truth justified their pre-trial tactics. In the long run, truth will be better served by orderly straightforward procedures than by deception and attempted surprise. We find no injustice in the fact that their stratagem misfired.[12]

### III.

Acknowledging that the admission of expert testimony is within the sound discretion of the trial judge, appellants contend that the court erred in refusing to hear their accident reconstruction expert because (a) the court permitted appellees to elicit expert testimony from a police officer; and (b) the physical facts were beyond the ken of a lay jury.

The police officer, however, was a witness tendered by appellants. He was effectively and properly cross-examined by appellees' counsel. The scope of that cross-examination did not, in our opinion, require the trial judge to hear testimony from another expert offered by appellants.

---

10. Appellants rely on this court's decision in Steiner v. C. I. R., 350 F.2d 217 (7th Cir. 1965), in arguing that the statement is admissible under F.R.Civ.P. 43(a). In *Steiner* we found no error in the fact that evidence obtained from a taxpayer by Internal Revenue Service agents without advice concerning his constitutional rights had been admitted by the tax court without objection. The opinion in no way precludes a determination that the trial judge here properly excluded evidence obtained by deception. On the contrary, the opinion in *Steiner* indicates that the court might have reached a contrary conclusion had the taxpayer been deceived concerning the identity of the federal agents. See 350 F.2d at 222.

11. "Yes. There are two driveways there. The first driveway which is normally used coming from the east going west. They always use the first drive. *She attempted to turn into the second drive.*

*That is what caused the whole thing. She passed him and then pulled her back and sat her down."* (Emphasis added.) App. 295

"Right. But she still caused the accident." App. 303

Since we determine that the statement did not impeach Thomas, Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503, cited by appellants in their reply brief, has no application. See Fowle v. United States, 410 F.2d 48, 52 (9th Cir. 1969); Cf., Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1.

12. Cf., Hamlet, Act III, Scene IV, et seq:
"Let it work;
For 'tis the sport to have the engineer
Hoist with his own petar: and't shall go hard
But I will delve one yard below their mines,
And blow them at the Moon." Act III, Scene IV, lines 207–211.

Appellants argue that the shortcomings in the eyewitnesses' testimony, together with the characteristics of the vehicles, their tire marks, consequences of relative speeds, and other physical facts, required explanation by a professional witness. We are satisfied that it was not an abuse of discretion for the trial judge to exclude the proffered testimony. We concur in his analysis of Illinois law [13] and are satisfied as a matter of federal law that the admissibility of expert testimony is within the sound discretion of the trial judge.[14] To determine where the fault lay, it was merely necessary for the jury to perform its historic function of appraising the credibility of witnesses.

The judgment is affirmed.

---

13. See McGrath v. Rohde, 265 N.E.2d 511 (Ill.App.2d Dist. Nov. 30, 1970), and cases cited therein.

14. See, e.g., Rhynard v. Filori, 315 F.2d 176, 178–179 (8th Cir. 1963).